**ENVIRO AIR, INC., et al., Plaintiffs,**

v.

**UNITED AIR SPECIALISTS, INC.,**
**Defendant.**

**Civ. A. No. 7177.**

United States District Court,
S. D. Ohio, W. D.

Nov. 18, 1970.

Roy F. Schaeperklaus, Pearce & Schaeperklaus, Cincinnati, Ohio, for plaintiffs.

John W. Melville, Melville, Strasser, Foster & Hoffman, Cincinnati, Ohio, for defendant.

ORDER

HOGAN, District Judge.

This is a patent case involving United States Letters Patent No. 3,421,290. The patent was applied for on February 16, 1967 and it issued on January 14, 1969 to the defendant United Air Specialists. The complaint contains two causes of action, the first being for a declaratory judgment declaring the above patent invalid; the second cause of action is purportedly based on the antitrust laws (Title 15, U.S.C.) and is a treble damage action based on a claimed antitrust assertion of a known invalid patent in various infringement actions brought against customers of the plaintiff; the second cause of action is bottomed on Walker Process Equipment Inc. v. Food Machinery Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

The plaintiffs' motion for a partial summary judgment in effect seeks a summary judgment "substancewise" in respect of each of the two causes of action.

The plaintiff asserts at least a half a dozen grounds for invalidity. Some are based on defective proceedings—so alleged—in the Patent Office evident by reference to the wrapper; a number are based on 35 U.S.C. § 102. The latter include claims of "was * * * on sale" more than a year prior to filing of the application, that the invention was in public use more than a year prior to application filing, that the invention was described in a printed publication more than a year prior to filing, et cetera. The ground most seriously urged is based on Section (b) of 102 and is this— that the invention involved in this patent "was on sale" in this country more than a year prior to the date of the application. As we have noted, the application was filed on February 16, 1967, so the critical date is February 16, 1966, and the question is whether or not the invention covered by this patent was on sale prior to February 16, 1966. "On sale" of course, in view of case law con-

struction, is not as simple as it might appear to be.

At first blush it would seem that summary judgment proceedings do not lend themselves to a question of patent validity—if for no other reason, due to the usual presumption attendant upon the issue of a patent.

While that seemed to be the initial reaction of the courts, the reaction has somewhat gone down the drain as a result of what Professor Moore calls an "uphill fight." The resolution of the question would, of course, depend to a great extent upon the alleged ground of the invalidity. There is not a great deal of relevancy between the usual presumption or the background of the presumption and the question whether or not the invention set forth in the patent was on sale more than a year before the application. Summary judgment proceedings have been held applicable to that type of controversy by the Ninth Circuit in Super Mold Corp. v. Clapp's Equipment Division, 397 F.2d 932 (9th Cir. 1968). Invalidity based on prior art was the ground for a summary judgment of invalidity in the district court in a case affirmed by the Sixth Circuit—Bobertz v. General Motors, 228 F.2d 984 (1955). See also Plechaty Co. v. Heckett, 145 F. Supp. 805 (N.D.Ohio 1956)—a summary judgment case based on Sections (a) and (b) of 35 U.S.C. § 102. It is concluded that if there is no genuine issue of fact on the record involving the question of "on sale" more than a year prior to application, a summary judgment may be appropriately granted.

The first question, of course, is what was the invention? The answer—and then we will get to the background—is cryptically set forth in the file wrapper and specifically in a memorandum of a conference between the Patent Office Examiner and counsel for the patentees as follows: "The critical features of this invention relate to the location of the inlets and outlets for the smoke removal system with respect to the entire room."

The subject dealt with was air cleaning. The object attacked was the removal of smoke or other impurities in the air in as cheap a manner as that could be done. The disclosure was of a "system having a ceiling inlet over the primary smoke source, and a remote clean air outlet in the ceiling, and a blower and air cleaning system providing limited air flow between the outlet and the inlet." This from the background of the invention (stated in application and patent):

"This invention relates to an indoor air cleaning system and has great and particular utility in the elimination and removal of tobacco smoke from commercial installations such as bowling alleys and the like. The system of this invention includes an electronic air cleaner or precipitator of the type generally in use for related purposes. However, by virtue of the combination as set out hereinafter, the instant invention accomplishes the general objective set out above with the utilization of one-third to one-half the equipment size and power heretofore required.

"That is, existing systems are currently designed for convenient installations as part of a complex heating and/or air conditioning system. In such installations, the air cleaning unit must be sized to accommodate the capacity of the entire system.

"It is a primary object of the instant invention to provide a more efficient air cleaning system for such installations, and at the same time to drastically reduce the size, cost and capacity of the air cleaning equipment."

There was nothing new about any of the equipment used to accomplish this. The equipment involved the use of a blower and an air cleaner and a diffuser and inlet and outlet piping. Concededly there was nothing new in the combination. Air cleaning equipment in commercial establishments, including bowling alleys, was in use at least by the early 1960's. This equipment was installed in connection with—not necessarily as a part of but in conjunction with—central heating equipment or central air

conditioning equipment and the cleaning equipment, that is to say, the air cleaning equipment, operated on all of the air going into or through the central heating or central air conditioning equipment. Of course, the central equipment dealt one way or another with all of the air in the entire installation. The air cleaning adjunct of a central system distinguished not between clean air drawn from one part of a commercial installation in which there was by and large only clean air on the one hand and, on the other hand, smoke-laden air drawn from another part of the same commercial installation. As a consequence the capacity of the air cleaning equipment had to have relationship to the entire air content of the particular installation involved, just as the air conditioning tonnage or the heat conditioning BTU had to be related. What was new about this invention was this: The inventors started with the recognition that in certain types of commercial installations the smoke or other impurity in the air is not evenly diffused in the atmosphere throughout the entire installation. As a matter of fact, in certain types of commercial installation the heated or cooled air throughout more than one-half of the installation may be quite free of any smoke. In that type of installation the smoke-laden air is concentrated in one place and the free or clean air may be said to be concentrated in another place. Just as it makes little economic sense to run hot air through a furnace, it makes little economic sense to run clean air through an air cleaner. So the ideal or (as described in the memorandum to which we have referred) the critical feature was to bring Mohammed to the mountain. The air cleaner would be located, where the "action was required"— of where the smoke-laden air was and this equipment would deal as far as possible only with that air, so that the air being run through the system was not the clean air but only the smoke-laden air. It must be conceded, at this stage of these proceedings, that the idea qualified as an "invention." At the same time there is no question that there was nothing new about any of the physical components of the system—inlets and outlets and blowers and diffusers and conduits and air cleaning machinery, as such, were all known and practiced before 1966. The placement was new and for purposes of this case at this time it is accepted that the placement alone involved an idea which qualified for the invention characterization.

The typical user for this proposed type of invention would be, of course, a bowling alley. It is the sole specific proposed user recited in the patent. And, of course, everyone knows that in the bowling alley the smoke is concentrated in and about the scoring tables, the usually adjacent audience seats and the also usually adjacent bar or fountain. The smoke relatively is totally absent at the other end of the alleys where the pins, et cetera, are located.

There is no question on this record that more than a year prior to the critical date the defendant had sold and installed in three bowling installations air cleaning equipment which included the "critical features of this invention" as has been above described. There is also no substantial question that the defendants, more than a year prior to the filing of the application, had installed systems in three bowling alleys, each of which included every item described in the one claim. There is included in the claim, as (f), this: "diffuser means operatively associated with said outlet and directing air flowing from said outlet toward said inlet only in a layer below and adjacent to said ceiling for creating a layer of moving air below and adjacent to said ceiling." Somewhat the same appears in (g) in the granted claim: "then from said outlet to said inlets only in a layer below and adjacent to said ceiling." A fair examination of this record and particularly the depositions of the inventors leads to the conclusion that this air flow is of no significance. It merely was descriptive of what was "believed" (see line 63 of the patent) happened. Whether it did or

didn't was not significant or critical to the practice of the invention; the inventors never deemed it important enough to ascertain whether it did or didn't happen and have charged infringement of the patent without relationship to any knowledge of the existence or nonexistence of such in the systems operated by the alleged infringers.

The defendant does not seriously contest the assertion that the systems installed in three bowling alleys prior to February 16, 1966 contained all of the critical elements of the invention. Rather the defense claims with respect to each of them that they were "experimental" and did not demonstrate an "on sale" as that term is used in the applicable section of 102.

In 1964 the commercial company with which the inventors were then connected, "Trion Sales Company" of Cincinnati, contracted to install a system for air cleaning purposes in the Del-Fair Lanes in Cincinnati, Ohio. The system turned out to be just what is described in the patent involved here. While the transaction bears many of the signs of an ordinary commercial one, it also bears some signs of the experimental. For instance, it was installed on an absolute guarantee that didn't stop there— the guarantee went on that if it didn't work satisfactorily the installers, which we will refer to as the defendant, would install an alternate system which had been time-proved. This, in our view, would make an issue of fact on the question of whether or not this installation was experimental. This Del-Fair installation was completed sometime in the early months of 1964. It worked quite satisfactorily.

The second installation, shortly thereafter, was at a bowling alley called "Varsity Lanes." There is absolutely nothing in this record based on which one could conclude that there was anything experimental about that installation as of the date of the contract for installation. The installation did have to be to the "satisfaction" of the Varsity Lanes people, but once that installation was made and approved the installers (the defendants) maintained absolutely no control over the system or anything related to it. There was nothing in the contract or the dealings of the parties indicating that the installers retained any right to go in and see how it was working or test it, nor is there anything in the record to indicate that the lanes were to do any reporting or anything else that is generally associated with "experiment." On the contrary, it was commercial finality once the installation and installation approval became facts.

There is some question of fact in this record on whether or not the Varsity Lanes installation operated satisfactorily. If this case were in a final hearing-merit status, that fact would not be regarded as determinative on the solution of the question of commercial sale v. experimental. However, we cannot say it is not relevant and since it is, we cannot say that there is no genuine issue of fact on the question with respect to the Varsity Lanes transaction.

Be that as it may, in early 1965 the factual situation had developed to the point that the defendant's then company had solicited a testimonial letter from Del-Fair Lanes attributing to the efficiency of the system. Testimonial letters are associated with the commercial and not with the experimental. In February of 1965 the company with which the defendant was then associated (i.e., the patentees) obtained a "lead" which somebody had picked up at the "Ohio Tavern Bar Show in Columbus" that the Rainbow Lanes in Fremont, Ohio, was interested in a smoke-elimination system. That business was solicited by the patentees with success. Solicitation for purchase, sale and installation sans subsequent control is in the commercial and not in the experimental. A contract was entered into on February 16, 1965, calling for the completion of the installation within 30 days. The contract price was approximately $3300. The contract did contain an absolute guarantee of satisfaction and a commitment to remove if the equipment was not operating satis-

factorily, provided the removal request was made within two weeks from the installation of the equipment. While one may find a connotation of experimentation in a simple obligation to remove and replace with a proven alternate, there is nothing in this Rainbow transaction which smacks of experimentation at all. The installation was a goodly distance from the service facilities of the defendants. The installation worked perfectly and it was promptly paid for cashwise. There was no request for any adjustment or removal or anything like that. The installer made no provision for inspection or for modification or for periodic reporting; in fact, the installer kept no control over the installation at all for any purpose; nor did the installer require any reporting of anything from the bowling lanes involved. Significantly, no requirement was imposed by the installer that the purchased machines be kept secret or in confidence.

Conceding that the "on sale" provision of § 102(b) requires a showing of reduction to practice ("Ajem," infra) the Rainbow transaction clearly demonstrates two things—the first is that as of the time of the Rainbow installation in March of 1965 the invention had been reduced to practice; secondly, that the invention was sold in a purely commercial transaction. We do not know how else to describe an installation which resulted from the pursuit of a "lead" which was promptly made, guaranteed with no strings attached and worked perfectly (see Exhibit 11 and Rainbow's letter of March 23, 1965). There was nothing contained in the contract which could be related to either experimentation or development. Nor did anything occur in fact at or after the installation remotely connected with either experimentation or development. If the use of just one patented article may constitute, in law, a "public use" as that term is used in Section 102—and such does appear to be the law (see Egbert v. Lippmann, 104 U.S. 333, 26 L.Ed. 755)—it would seem to follow that one ordinary, everyday purely commercial sale is sufficient to satisfy the requirement of § 102(b)—"on sale." Compare Ajem Laboratories Inc. v. C. M. Ladd, 424 F. 2d 1124 (6 Cir. 1970) and *Super Mold Corporation,* supra.

It is therefore the holding of this Court that the patent in suit is invalid under the "on sale" provision of 35 U.S.C. § 102(b).

With respect to the second cause of action, the motion for a summary judgment will be denied. One of the questions basic to this cause of action, as pointed out by the Supreme Court in *Walker,* supra, is whether the alleged activity of the defendant constituted "intentional fraud" or "good faith" action. It is difficult to see how the determination of such questions could rest on anything but a full oral hearing.

No final judgment will be entered at this time in respect of the first cause of action. See Civil Rule 55(b).